UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil No. _____

Edwin Alemany,
Appellant

vs.

Stephen Kennedy,
Respondent

**ADDENDUM A**

_____

MASSACHUSETTS SUPREME JUDICIAL COURT RULING
DATED OCTOBER 4, 2021

_____

## Commonwealth v. Alemany

Supreme Judicial Court of Massachusetts

April 5, 2021, Argued; October 4, 2021, Decided

SJC-12180.

**Reporter**
488 Mass. 499 *; 174 N.E.3d 649 **; 2021 Mass. LEXIS 576 ***

COMMONWEALTH vs. EDWIN J. ALEMANY.

**Prior History:** [***1] Suffolk. INDICTMENTS found and returned in the Superior Court Department on November 15, 2013.

The cases were tried before *Frank M. Gaziano*, J., and a motion for a new trial, filed on December 31, 2018, was considered by *Christine M. Roach*, J.

**Disposition:** Judgments affirmed. Order denying motion for a new trial affirmed.

**Counsel:** *Andrew S. Crouch* for the defendant.

*Cailin M. Campbell*, Assistant District Attorney (*John P. Pappas*, Assistant District Attorney, also present) for the Commonwealth.

**Judges:** Present: BUDD, C.J., CYPHER, KAFKER, WENDLANDT, & GEORGES, JJ.

**Opinion by:** CYPHER

## Opinion

[**653] CYPHER, J. A jury convicted Edwin J. Alemany, the defendant, of murder in the first degree on theories of deliberate premedita- [*500] tion, extreme atrocity or cruelty, and felony-murder for strangling and stabbing Amy Lord. He also was convicted of a number of other offenses, including armed robbery, aggravated assault and battery by means of a dangerous weapon, and attempted murder, for the attacks on Lord, Alexandra Cruz, and Kayleigh Ballantyne.[1] The sole issue before the jury was whether the defendant was criminally responsible for his conduct during the three assaults. Following [***2] his convictions, the defendant moved for a new trial on the ground that his trial counsel had conceded his guilt and proceeded with an insanity defense over his objection. His request for a hearing and his motion were denied. The defendant's appeal from the denial of his motion for a new trial was consolidated with his direct appeal.

The defendant contends that the judge's instructions on criminal responsibility were erroneous; the prosecutor made several improper remarks in his opening statement and closing argument; and the motion judge, who was not the trial judge,[2] erred in denying his request for a hearing and his motion for a new trial. He also asks the court to review the case under G. L. c. 278, § 33E. After a thorough review of the record, we decline to exercise our authority under § 33E to grant a new trial or reduce or set aside the verdict of murder [**654] in the first degree, and we affirm the judgments.

*Background*. We recite the relevant facts that the jury could have found. On July 23, 2013, over the course of twenty hours, the defendant committed three separate violent attacks, killing one woman, Amy Lord, and injuring two others, Alexandra Cruz and Kayleigh Ballantyne. There was an overwhelming [***3] amount of evidence consisting of victim and witness accounts, out-of-court and in-court identifications, surveillance footage, and forensic evidence.

At 4:23 A.M., the defendant approached Cruz and hit her on her jaw as she was walking to work in the South Boston section of Boston. The defendant rendered Cruz briefly unconscious and [*501] dragged her into a parking lot where he choked her and told her that if she screamed, he would kill her. Cruz pleaded with the defendant to stop, and the defendant responded, "Bitch, just know that you're going to die today." When the defendant briefly turned away, Cruz ran

---

[1] The defendant was indicted on charges of murder in the first degree, kidnapping, carjacking, intimidation to steal from a depository, four counts of armed robbery, armed robbery while masked, armed assault with intent to rob, assault with intent to rape, burning of personalty, two counts of attempted murder, three counts of assault and battery, aggravated assault and battery by means of a dangerous weapon, armed assault with intent to murder, and robbery. He was convicted on all charges except assault with intent to rape.

[2] The trial judge had been appointed an Associate Justice of this court.

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 3 of 13

488 Mass. 499, *501; 174 N.E.3d 649, **654; 2021 Mass. LEXIS 576, ***3

across the street. The defendant then told Cruz, "I fucked up," and that he was looking for someone else. He threw her belongings toward her and told her not to call the police because he knew where she worked. Cruz ran to work at a store, and about one hour later, a police officer came to the store. The next day, Cruz identified the defendant in a photographic array as her attacker and later identified him in court.

Around 5:38 A.M., Amy Lord, when leaving her apartment building, was attacked by the defendant in the vestibule of her building.[3] He then forced her into her car, with a mask covering [***4] his face, and drove to five different automated teller machines forcing Lord to withdraw $960 in total from her bank account.

The defendant then brought Lord to a secluded area. He took off her clothes, beat her, stabbed her over forty times, strangled her,[4] and left her naked body lying on an isolated path in a wooded area.

The defendant left the area in Lord's car, and over the next forty minutes he purchased gasoline at a station in the Roslindale section of Boston, drove back to South Boston, and set fire to Lord's car.

The defendant then began to spend Lord's money, paying cell phone bills; buying a new cell phone, lottery tickets, and alcohol; and hiring a livery car to take him to his friend Eric Cataloni's home in Roslindale. The defendant spent the evening eating and drinking with Cataloni, the defendant's brother, and another friend. At around 10:30 P.M., Cataloni drove the intoxicated defendant to South Boston, and he passed out on the back seat.

When the defendant arrived home, he banged on the front door; his girlfriend, Elisabeth Stephenson, and their toddler daughter were asleep inside. After Stephenson and the defendant began to argue, Stephenson left the apartment with [***5] their daughter, fleeing to her nearby car, and driving around aimlessly. When she re- [*502] turned a short time later, she saw the defendant walking away from the apartment.

---

[3] Amy Lord's face as depicted in the bank surveillance footage supported that she had been beaten. Additionally, Lord's contact lens was found in the vestibule of her apartment building, and there was impact damage to a wall there.

[4] At trial, the medical examiner opined that Lord died from the combination of sharp force injuries to her neck and asphyxia by strangulation.

Twenty minutes later, at around midnight, Ballantyne saw the defendant on the opposite side of the street as she walked toward her apartment. As she entered the [**655] passcode to her front door, she felt a person — the defendant — directly behind her. The defendant pushed her, and she hit her head on the floor. The defendant stood over her and stabbed her left arm five times, her left breast two times, her left rib once, and the left side of her face. Ballantyne pleaded with him to take the contents of her purse and her cell phone, and she screamed for help and kicked the defendant. One of her kicks knocked the defendant over, and he fled. Ballantyne crawled to her apartment, used her keys to open the door, and got her roommates' attention. Her roommates and neighbors who had heard Ballantyne's screams called 911.

Before she was taken to a hospital, Ballantyne described her attacker as a Hispanic male, five feet, eight inches tall, medium build, with a "buzz cut," and wearing a dark shirt and a Boston Red Sox baseball cap. Ballantyne's [***6] roommate went to the hospital with her and encountered the defendant, who had his hand wrapped and was upset because he was not receiving treatment. Ballantyne's roommate noticed that the defendant matched the description of the attacker and sent a text message to their other roommate, who was still at their apartment with law enforcement, regarding the defendant's presence at the hospital.

The defendant was taken into custody at the hospital, read Miranda warnings, and questioned by police after waiving his Miranda rights. The defendant told the police that he had injured his hand trying to defend himself during an altercation with a man at a gasoline station. Detectives obtained the surveillance video recording from the gasoline station; although it captured the defendant, it did not show any such attack.

After he was interviewed, the defendant was arrested for the stabbing of Ballantyne. Subsequent investigation revealed that the defendant was included as a contributor to bloodstains found in a trail leading from where Ballantyne was attacked, and that Lord was included as a contributor to bloodstains found on the defendant's sneakers. At trial, defense counsel conceded that the defendant had attacked [***7] Cruz, Lord, and Ballantyne, but argued that he was not guilty by reason of insanity.

The defendant's expert, Dr. Keith Ablow, testified that, at the time of the three attacks, the defendant had been suffering from [*503] a major mental illness. According to Ablow, the defendant had been diagnosed with a dissociative disorder, major depression, alcohol use disorder, and borderline personality disorder. The defendant's mother had

Case 1:22-cv-11678 Document 1-1 Filed 10/03/22 Page 4 of 13

488 Mass. 499, *503; 174 N.E.3d 649, **655; 2021 Mass. LEXIS 576, ***7

schizophrenia, and the defendant reported that when he was around twelve years old, he had been abused sexually by an older male. The defendant also began using drugs at around age thirteen, and, at fourteen, he was hit on the head by a brick and rendered unconscious. The defendant had spent much of his adolescent years in the custody of the Department of Youth Services, where he had had six hospitalizations, with reports of suicidal and homicidal thoughts. After turning eighteen, he was in and out of jail, and when not incarcerated, he would self-medicate with alcohol and drugs. Ablow opined that, at the time of the incidents, the defendant substantially could not appreciate the wrongfulness of his actions, nor could he conform his behavior to the requirements of the [***8] law.

By contrast, the Commonwealth's expert, Dr. Martin Kelly, who also interviewed the defendant, opined that the defendant only suffered from an antisocial personality disorder. In Kelly's opinion, the defendant had had no mental disease or defect at the time of the crimes, or at any other point, that resulted in the lack of [**656] substantial capacity to appreciate the criminality or wrongfulness of his conduct, or the lack of substantial capacity to conform his conduct to the requirements of the law. Kelly opined that the defendant seemed guarded and careful throughout his interview, reflecting on answers, and never distracted. The defendant had not had any recent hospitalizations, and there was no evidence that he had been treated for a suicidal act.

*Discussion*. 1. *Jury instructions*. The defendant argues that the judge's instructions on criminal responsibility were erroneous because when explaining the third possible method of proof open to the Commonwealth, the judge stated that even "if the defendant lacked substantial capacity to appreciate the wrongfulness or criminality of his conduct *and* to conform his conduct to the requirements of the law, the lack of such capacity was solely the [***9] result of voluntary intoxication," when he should have said that "if the defendant lacked substantial capacity to appreciate the wrongfulness or criminality of his conduct *or* to conform his conduct to the requirements of the law, the lack of such capacity was solely the result of voluntary intoxication." The defendant argues that use of the word "and" instead of the word "or" varied from the 2018 Model Jury Instructions on Homicide (2018 model [*504] jury instructions) and reduced the Commonwealth's burden of proof, creating a substantial likelihood of a miscarriage of justice. The Commonwealth argues that we must look at the jury instruction as a whole and that a deviation from a model jury instruction, standing alone, does not render the instruction erroneous. The defendant did not object at trial. Accordingly, if there was error, we review the challenged instruction to determine whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Dyer, 460 Mass. 728, 745, 955 N.E.2d 271 (2011)*, cert. denied, 566 U.S. 1026, 132 S. Ct. 2693, 183 L. Ed. 2d 55 (2012). We conclude that the judge's instructions contained an error of law but that the error did not result in a substantial likelihood of a miscarriage of justice.

The judge instructed the jury in accordance with the 2013 Model [***10] Jury Instructions on Homicide (2013 model jury instructions) that were applicable at the time of trial:

> "Remember that the Commonwealth must prove to you beyond a reasonable doubt the defendant was criminally responsible at the time the crime was committed. That is, the defendant did not lack criminal responsibility at the time. Therefore, it's the Commonwealth's burden to prove at least one of the following beyond a reasonable doubt.
>
> "Number one, that at the time of the alleged crime the defendant did not suffer from a mental disease of defect. Or, number two, that if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongfulness of or criminality of his conduct and to conform his conduct to the requirements of the law. Or, number three, that if the defendant lacked substantial capacity to appreciate the wrongfulness or criminality of his conduct *and* to conform his conduct to the requirements of the law, the lack of such capacity was solely the result of voluntary intoxication by alcohol or other drugs" (emphasis added).

With respect to the third way in which the Commonwealth may prove a defendant did not lack [***11] criminal responsibility, the current (2018) model jury instructions provide: "3. That, if the defendant lacked the substantial capacity to appreciate the wrongfulness or criminality of his conduct *or* to conform his conduct to the requirements [**657] of the law, his lack of such capacity was solely the result of voluntary intoxication by alcohol or other drugs" (em- [*505] phasis added).[5]

---

[5] The 2013 model jury instructions state, in relevant part:

"[I]t is the Commonwealth's burden to prove at least one of the following beyond a reasonable doubt: 1. That at the time of the alleged crime the defendant did not suffer from a mental disease or defect; or 2. That if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongfulness or criminality of his conduct and to conform his conduct to the requirements of the law; or 3. [Where there is evidence the defendant consumed drugs or alcohol] That if the defendant lacked the substantial

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 5 of 13

488 Mass. 499, *505; 174 N.E.3d 649, **657; 2021 Mass. LEXIS 576, ***11

The instructions the judge provided at the defendant's 2015 trial conformed precisely with the model instructions in place at the time of the trial, which were adopted in 2013.[6] We have urged [*506] trial judges to follow the model jury instructions verbatim, *Commonwealth v. Vargas, 475 Mass. 338, 353, 57 N.E.3d 920 (2016)*, and the trial judge did so here. Nonetheless, the instructions contained an error of law. The error did not, however, rise to the level of a substantial likelihood [***13] of a miscarriage of justice.[7]

[**658] We disagree with the defendant that this error lowered the Commonwealth's burden of proof, and we conclude that the error was unlikely to have influenced the jury's conclusion. See *Commonwealth v. Berry, 457 Mass. 602, 618, 931 N.E.2d 972 (2010)*. When a defendant raises an insanity defense, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant was criminally responsible. See *Commonwealth v. Dunphe, 485 Mass. 871, 878, 153 N.E.3d 1254 (2020)*. Here, the instruction, even including the error, adequately conveyed to the jury that the Commonwealth must prove beyond a reasonable doubt that where the defendant may have had a mental illness that resulted in his lack of substantial capacity to appreciate the wrongfulness of his actions, at the relevant time, his voluntary intoxication was the sole cause of his incapacity, not his mental illness.

The Commonwealth can satisfy its burden in several ways. Most simply, the Commonwealth can prove that the defendant did not have a mental disease or defect at the time of the alleged criminal conduct. See *Dunphe, 485 Mass. at 879* ("If the Commonwealth proves beyond a reasonable doubt that the defendant did not have a mental disease or defect at the time of the crime, the defense of lack of criminal responsibility [***14] fails"). If, however, the defendant did have a mental disease or defect at the time of [*507] the alleged criminal conduct, the Commonwealth can prove that such disease or defect did not cause the defendant "to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" (citation omitted). *Commonwealth v. Lawson, 475 Mass. 806, 811, 62 N.E.3d 22 (2016)*. See *Commonwealth v. DiPadova, 460 Mass. 424, 431, 951 N.E.2d 891 (2011)* ("The *source* of the lack of substantial capacity is the critical factor in determining whether the defendant is criminally responsible"). In effect, this means the Commonwealth must

---

capacity to appreciate the wrongfulness or criminality of his conduct and to conform his conduct to the requirements of the law, his lack of such capacity was solely the result of voluntary intoxication by alcohol or other drugs" (footnote omitted).

The complete text of the 2013 model jury instructions is available at https://www.mass.gov/files/documents/2017/10/23/murder-instructions.pdf [https://perma.cc/BJ23-UXYK].

The 2018 model jury instructions state, in relevant part:

"[I]t is the Commonwealth's [***12] burden to prove at least one of the following beyond a reasonable doubt: 1. That at the time of the alleged crime, the defendant did not suffer from a mental disease or defect; or 2. That if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongfulness or criminality of his conduct and to conform his conduct to the requirements of the law; or 3. [Where there is evidence the defendant consumed drugs or alcohol] That, if the defendant lacked the substantial capacity to appreciate the wrongfulness or criminality of his conduct or to conform his conduct to the requirements of the law, his lack of such capacity was solely the result of voluntary intoxication by alcohol or other drugs" (footnote omitted).

[6] At that time, Massachusetts had adopted the Model Penal Code (MPC) test for criminal responsibility: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality (wrongfulness) of his conduct *or* to conform his conduct to the requirements of law" (emphasis added). *Commonwealth v. McHoul, 352 Mass. 544, 546-547, 226 N.E.2d 556 (1967)*. The MPC test for criminal responsibility combined the rule set out in *M'Naghten's Case*, 8 Eng. Rep. 718 (1843), which assessed the capacity of a defendant to know right from wrong, see *Commonwealth v. Chester, 337 Mass. 702, 711, 150 N.E.2d 914 (1958)*, and the "irresistible impulse" rule, which assessed whether criminal conduct was the result of irresistible impulse produced by mental disease or defect, see *Commonwealth v. Clark, 292 Mass. 409, 414, 198 N.E. 641 (1935)*. If mental illness causes a defendant to lose the capacity to know right from wrong or to conform his or her conduct to the requirements of the law, the defendant cannot be held criminally responsible. See *McHoul, supra.*

[7] In their briefs, neither the defendant nor the Commonwealth mentions the 2013 model jury instructions, or the fact that the judge's instruction precisely matched the model. The Commonwealth submitted a postargument letter pursuant to *Mass. R. A. P. 22 (c) (2)*, as appearing in 481 Mass. 1651 (2019), acknowledging this. Notably, the Commonwealth's brief also appears to misquote the 2018 model jury instructions. The Commonwealth states: "The defendant compares the instruction given to the model instruction which reads, in the relevant portion, 'Or, number two, that if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongfulness of or criminality of his conduct *or* to conform his conduct to the requirements of the law'" (emphasis in brief). Under the second possible method of proof open to the Commonwealth, the 2018 model instructions properly use the word "and," not the word "or," as the Commonwealth suggests. The 2013 instructions also use the word "and," not the word "or," in the second prong.

Case 1:22-cv-11678 Document 1-1 Filed 10/03/22 Page 6 of 13

488 Mass. 499, *507; 174 N.E.3d 649, **658; 2021 Mass. LEXIS 576, ***14

prove that mental illness did not cause the defendant to lose the capacity to appreciate the criminality of his or her conduct, and that mental illness did not cause the defendant to lose the capacity to conform his or her conduct to the law.

If mental illness caused the defendant to lose the capacity for either aspect of the test (the capacity to appreciate the criminality of his or her conduct, otherwise known as the *M'Naghten* rule, or the capacity to conform his or her conduct to the law under the "irresistible impulse" rule), the defendant cannot be held criminally responsible. This is true even where the defendant also consumed alcohol or drugs [***15] — and thereby potentially aggravated the mental illness — so long as the mental illness remained the cause of the lack of capacity. *DiPadova, 460 Mass. at 431-432*. However, where the defendant's loss of capacity resulted solely from the voluntary consumption of alcohol or drugs, the defendant may be held criminally responsible. See *id. at 431* ("a defendant whose lack of substantial capacity is due solely to [voluntary consumption of alcohol or drugs, intoxication and even alcoholism or drug addiction], and not to any mental disease or defect, is criminally responsible"). [**659] Thus, even if a defendant had a mental disease or defect at the time of the crime, and even if the defendant lacked the capacity to appreciate the criminality of his or her conduct or to conform that conduct to the law, the defendant may be held criminally responsible if the Commonwealth proves that the defendant's loss of capacity was the result of voluntary intoxication.

The provisions of the model jury instructions at issue here — whether considering the 2013 or 2018 instructions — encompass these three concepts. They instruct that, in order for a defendant to be held criminally responsible, the Commonwealth must prove either (1) the defendant did not [***16] suffer from a mental illness; (2) if the defendant suffered from a mental illness, such illness did not cause the defendant to lose the capacity to appreciate the [*508] criminality of his or her conduct and to conform his or her conduct to the law; or (3) if the defendant suffered from a mental illness that caused a loss of capacity to appreciate the criminality of his or her conduct or to conform his or her conduct to the law, such loss of capacity was solely the result of the voluntary consumption of alcohol or drugs.

With respect to the second prong, the word "and," which appears in both the 2013 and the 2018 model jury instructions, is the correct word to use because the Commonwealth must prove both that mental illness did not cause the defendant to lose capacity to appreciate right from wrong and that mental illness did not cause the defendant to lose capacity to conform his or her conduct to the law. In the third prong, however, the word "or" is the correct word to use, because if the Commonwealth proved only, for example, that the defendant lost capacity to appreciate criminality because of voluntary intoxication, the defendant still could be held criminally responsible. The Commonwealth [***17] would not also need to prove that the defendant's loss of capacity to conform his conduct to the requirements of the law was the result of voluntary intoxication. Thus, the 2013 model jury instructions were incorrect.

Taken in context, the use of the word "and" instead of the word "or" in the third prong of the instruction did not affect the jury's understanding of the instruction and therefore lower the Commonwealth's burden of proof. "In this process, we require the Commonwealth to prove negatives beyond a reasonable doubt: that the defendant did not have a mental disease or defect at the time of the crime and, if that is not disproved beyond a reasonable doubt, that no mental disease or defect caused the defendant to lack substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Lawson, 475 Mass. at 811*, quoting *Commonwealth v. Keita, 429 Mass. 843, 849-850, 712 N.E.2d 65 (1999)*, citing *Commonwealth v. McHoul, 352 Mass. 544, 546-547, 226 N.E.2d 556 (1967)*. If the Commonwealth cannot meet its burden with regard to the second prong — that the defendant "retained the substantial capacity to appreciate the wrongfulness or criminality of his conduct and to conform his conduct to the requirements of the law" — then the Commonwealth moves on to the third prong. The instruction [***18] provided in this case was clear that if the Commonwealth had not met its burden of proof on the second prong then the jury would consider whether such loss of capacity was the result of voluntary intoxi- [*509] cation. While the use of the word "and" in the third prong was incorrect because the Commonwealth would have failed to meet its burden even if only one of the subfactors of the second prong were proved beyond a reasonable doubt (and the instruction on the second prong [**660] makes that clear), the instruction in context does not create any meaningful ambiguity and did not rise to the level of a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Gunter, 427 Mass. 259, 270, 692 N.E.2d 515 (1998), S.C., 456 Mass. 1017 (2010)* and *459 Mass. 480, 945 N.E.2d 386*, cert. denied, *565 U.S. 868, 132 S. Ct. 218, 181 L. Ed. 2d 119 (2011)*.

If the jury consider the third prong, it is only because the Commonwealth has failed to prove that the defendant retained the substantial capacity both to appreciate the wrongfulness or criminality of his conduct *and* to conform his conduct to the requirements of the law. The use of the word "and" instead of "or" in the third prong does not, as the defendant suggests, leave the jury with the impression that the Commonwealth

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 7 of 13

488 Mass. 499, *509; 174 N.E.3d 649, **660; 2021 Mass. LEXIS 576, ***18

only need be held to its burden of proof if both elements of the third prong were present. The jury's [***19] consideration of the third prong is evidence that the Commonwealth did not meet its burden in the second prong because it failed to prove both elements — that the defendant retained the substantial capacity (1) to appreciate the wrongfulness or criminality of his conduct and (2) to conform his conduct to the requirements of the law. The salient question is not whether both elements are present, but whether the defendant's voluntary intoxication resulted in either element. To consider whether the defendant's voluntary intoxication resulted in both elements, by using the word "and" instead of "or," does not lessen the Commonwealth's burden of proof.

Even if the instruction is not read in context, it required the jury to consider whether the defendant's loss of capacity was the result of voluntary intoxication if the defendant lacked substantial capacity both to appreciate the criminality of his conduct and to conform his conduct to the law. Under our jurisprudence, however, a defendant is not criminally responsible either if the defendant did not know right from wrong or if the defendant could not conform his or her conduct to the law. Taken together with the law on intoxication, a defendant [***20] can be held criminally responsible if the defendant (1) knew right from wrong but (2) could not conform his conduct to the law only because of voluntary intoxication. The alleged error in the instruction, read literally, suggests that voluntary intoxication is relevant only where a defendant did [*510] not know right from wrong and could not conform his or her conduct to the law. Thus, a jury following these instructions could not find a defendant criminally responsible who knew right from wrong but could not conform his or her conduct to the law as a result of voluntary intoxication. For this reason, we agree with the Commonwealth that, if anything, this error heightened the Commonwealth's burden of proof by requiring the Commonwealth to prove that both the defendant's lack of capacity to appreciate the wrongfulness or criminality of his conduct *and* his lack of capacity to conform his conduct to the requirements of the law were solely the result of voluntary intoxication.

The defendant attempts to analogize his case to *Berry, 457 Mass. at 618*, and *DiPadova, 460 Mass. at 437*, where the court ordered new trials based on deficient instructions on criminal responsibility, by arguing that the jury could have misinterpreted the instructions here [***21] to mean that, even if the defendant's mental illness by itself caused the defendant to lack substantial capacity, the defendant's criminal responsibility defense would fail if the defendant consumed drugs or alcohol that contributed to his incapacity. The asserted error in the instruction (the use of "and" [**661] instead of "or"), however, does not further this argument.

The instruction was clear that voluntary intoxication had to be the sole reason for the loss of capacity, not just a contributing factor.[8] The defendant also misapprehends *Commonwealth v. Goulet, 374 Mass. 404, 414-416, 372 N.E.2d 1288 (1978)*. There, the judge initially instructed, in effect, that the Commonwealth "must show the defendant to have had substantial capacity both to appreciate the wrongfulness of his conduct and to conform his conduct to the law." *Id. at 415*. Contrary to the defendant's contention, we did not take issue with this instruction and it conforms with the second prong of the 2018 instruction.

 [*511] 2. *Opening and closing remarks*. The defendant argues that certain of the prosecutor's remarks in his opening statement and closing argument were made to inflame the jury's emotions and invoke the jury's sympathy for Lord's family and their fear of the defendant. Where the defendant objected, [***22] we review for prejudicial error. See *Commonwealth v. Kent K., 427 Mass. 754, 759 n.5, 696 N.E.2d 511 (1998)*. Where the defendant did not object at trial, we review for a substantial likelihood of a miscarriage of justice. See *Commonwealth v. Wright, 411 Mass. 678, 681, 584 N.E.2d 621 (1992)*, *S.C., 469 Mass. 447 (2014)*. In either event, we consider the remarks in the context of the whole opening or closing, as well as the entire case. See *Commonwealth v. Niemic, 472 Mass. 665, 673, 37 N.E.3d 577 (2015)*, *S.C., 483 Mass. 571 (2019)*. The judge instructed the jury before opening statements and during his final charge to the jury that opening statements and closing arguments are not evidence. After the closing arguments, the judge instructed the jury that the case must be decided based upon evidence and not upon emotion or sympathy.

---

[8] The judge also instructed that a "defendant's lack of criminal responsibility must be due to a mental disease or defect. Intoxication caused by the voluntary consumption of alcohol or drugs by itself is not a mental disease or defect. Where a defendant lacked substantial capacity to appreciate the criminality or wrongfulness or to conform his conduct to the law solely as a result of voluntary intoxication, then he is criminally responsible for his conduct. However, the consumption of alcohol or drugs may trigger or intensify, make worse, a defendant's preexisting mental disease or defect. If it did so here, and the mental disease or defect then caused the defendant to lose substantial capacity to appreciate the criminality or wrongfulness of his conduct or to conform his conduct to the requirements of the law, the defendant is not criminally responsible for his conduct."

Case 1:22-cv-11678 Document 1-1 Filed 10/03/22 Page 8 of 13

488 Mass. 499, *511; 174 N.E.3d 649, **661; 2021 Mass. LEXIS 576, ***22

a. *Opening statement*. The defendant argues that references in the opening to Lord's "forever age," likening the offenses to a "real life horror story," and warning the jury that the person accused was sitting ten feet away from them, were irrelevant to any material issue and warrant a new trial. The defendant did not object to these statements at trial.

"The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence" (citation omitted). *Commonwealth v. Hoilett, 430 Mass. 369, 372, 719 N.E.2d 488 (1999)*. We have cautioned prosecutors that their opening statements should "not slip [***23] into emotionally provocative argument." See *Commonwealth v. Degro, 432 Mass. 319, 322 n.4, 733 N.E.2d 1024 (2000)*. A prosecutor may use the opening to set the scene, however, even if that scene is unfavorable to the defendant. See *Kent K., 427 Mass. at 759 n.6*. In addition, "[t]he prosecutor is entitled to tell the jury something of the person whose life [has] been lost in order [**662] to humanize the proceedings" (quotation and citation omitted). *Commonwealth v. Rodriguez, 437 Mass. 554, 566, 773 N.E.2d 946 (2002)*.

The prosecutor's opening statement did not create a substantial likelihood of a miscarriage of justice. Before the prosecutor mentioned Lord, he discussed the two other victims, Cruz and Ballantyne, and their respective ages, twenty-two and twenty-one. The proximity in the victims' ages (among other similarities) [*512] provided some explanation for why the defendant targeted these particular victims; without that, the Commonwealth otherwise presented no clear evidence of motive or any connection between the victims and the defendant. Compare *Kent K., 427 Mass. at 759-760* (references to victim's age relevant to theory of extreme atrocity or cruelty). In the course of his opening, the prosecutor mentioned Lord's age only once. Compare *Commonwealth v. Santiago, 425 Mass. 491, 494, 681 N.E.2d 1205 (1997)*, *S.C., 427 Mass. 298* and *428 Mass. 39*, cert. denied, 525 U.S. 1003, 119 S. Ct. 514, 142 L. Ed. 2d 426 (1998).

Describing the alleged crimes as part of a "horror story" did not rise past the level of excusable hyperbole. See *Commonwealth v. Lyons, 426 Mass. 466, 472, 688 N.E.2d 1350 (1998)* ("grisly" [***24] depiction of victim's murder not improper). The evidence presented at trial was that the defendant brutally attacked three women, killing one, in the span of twenty hours. Cruz was attacked while walking to work; Lord was abducted as she was about to leave her apartment for an exercise class, robbed, taken to a secluded park, and stabbed more than forty times; and Ballantyne was attacked while walking home from work. While certainly dramatic, the statement was rooted in the evidence ultimately presented at trial, and the jury would have been able to sort out any hyperbole. See *Santiago, 425 Mass. at 500*.

Finally, telling the jury that the person accused of the crimes was sitting ten feet away from them is not particularly troubling. After all, the person accused of the crimes was the defendant — who was present in the court room — and a number of witnesses identified him as the perpetrator of the crimes throughout the trial. That the defendant did not object to these statements at trial is some indication that the tone and manner of the statements were not unfairly prejudicial. See *Commonwealth v. Mello, 420 Mass. 375, 380, 649 N.E.2d 1106 (1995)*. In sum, the prosecutor's remarks did not result in a substantial likelihood of a miscarriage of justice.

b. *Closing argument*. The [***25] defendant argues that the prosecutor improperly appealed to the jury's emotions in his closing argument by referring to the victim as "forever twenty-four years old" and with numerous descriptions of how Lord's death affected her parents. We conclude that certain of the prosecutor's statements were improper. Nonetheless, the remarks do not warrant reversal of the defendant's convictions. The prosecutor's closing spanned thirty-five pages of transcript, primarily focused on the defendant's mental state, and referred to testimony and evidence that indicated that the defendant was aware of right and wrong and could, when he chose, conform his conduct to the rule of law.

[*513] We begin with portions of the closing to which the defendant did not object. "Thus, we consider, 'in the context of the arguments and the case as a whole,' whether the improper statement created a substantial likelihood of a miscarriage of justice" (citation omitted). *Commonwealth [**663] v. Kolenovic, 478 Mass. 189, 201, 84 N.E.3d 781 (2017)*. In the beginning of the closing, the prosecutor remarked:

> "Amy Elizabeth Lord, forever twenty-four years old, the daughter of Cindy and Dennis Lord. For twenty-four years they raised and loved their daughter, and then on July 23rd, 2013, they were dealt the [***26] cruelest of blows. They had to hear the words that no parent should ever have to hear. After going missing, their daughter was gone, the victim of a brutal abduction, robbery, and murder. No more gym, no more job, no more family trips. Amy Lord, forever twenty-four, will never walk down the aisle with her dad on her wedding day."

Although reference to Lord's age as "forever" being twenty-four was unnecessary, it was not excessive. See

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 9 of 13

488 Mass. 499, *513; 174 N.E.3d 649, **663; 2021 Mass. LEXIS 576, ***26

Commonwealth v. Rutherford, 476 Mass. 639, 644, 71 N.E.3d 481 (2017) (enthusiastic rhetoric, strong advocacy, and excusable hyperbole do not require reversal). As mentioned *supra*, the prosecutor is permitted to humanize the victim. See Rodriguez, 437 Mass. at 566. The reference to Lord never being able to "walk down the aisle with her dad on her wedding day," however, exceeded the bounds of excusable hyperbole. This statement had no relevance to the defendant's guilt and was an improper appeal to the passions or sympathies of the jury. See Commonwealth v. Vazquez, 65 Mass. App. Ct. 305, 312, 839 N.E.2d 343 (2005). Nonetheless, when considering the case as whole, the statement did not result in a substantial likelihood of a miscarriage of justice. See Niemic, 472 Mass. at 673.

The evidence against the defendant was overwhelming, see Commonwealth v. Silvelo, 486 Mass. 13, 18, 154 N.E.3d 904 (2020), and the only real issue at trial was whether the defendant could be held criminally responsible for his conduct. [***27] See Niemic, 472 Mass. at 674 (considering "whether the Commonwealth's case was so overwhelming that the errors did not prejudice the defendant" [citation omitted]). Two mental health experts testified at length, and defense counsel made clear in his own closing argument that the defendant's mental health and state of mind were what the jury had to decide. The prosecutor, too, spent much of his closing discussing whether the evidence suggested that the defendant had [*514] had the requisite mental state to be held criminally responsible for the crimes. Although some of the prosecutor's argument inappropriately appealed to the jurors' sympathies, the statements did not go to the heart of the defense strategy. See Kolenovic, 478 Mass. at 201.

Furthermore, the evidence of the brutal nature of the murder was overwhelming. The defendant took off Lord's clothes, beat her, stabbed her more than forty times, strangled her, and left her naked body. It is "unlikely that the prosecutor's argument had an inflammatory effect on the jury beyond that which naturally would result from the evidence presented." Commonwealth v. Bois, 476 Mass. 15, 35, 62 N.E.3d 513 (2016). The prosecutor's comments about Lord's family were unlikely to have affected the jury's deliberations, especially in light of the judge's curative [***28] instruction. The judge, alert to the prosecutor's use of potentially inflammatory words, also advised the jury after the prosecutor's closing that they were not to focus on any labels the prosecutor used and to focus on the offense conduct. That the jury acquitted the defendant of one charge — assault with intent to commit rape — is some evidence that they complied with this instruction. See *id*.

The defendant also argues that two additional remarks from the prosecutor were improper, because they improperly [**664] suggested that the jurors should place themselves in Lord's shoes. The prosecutor stated,

"You're thinking to yourself, she's out of the car. You're thinking to yourself, Amy, run. Just run, just go. It's so easy. No one will catch you. He won't catch you. Imagine, if you will, just think of the fear he put her in in that vestibule. …"

And he continued:

"Collectively you fifteen fair and impartial jurors walked Amy Lord's last walk, and you stood in the very spot where her life ended at the hands of Edwin J. Alemany."

It is improper for a prosecutor to ask a jury to put themselves in the victim's shoes because it "distracts attention from the actual issues, and invites the jury to [***29] decide guilt or innocence on the basis of sympathy." Commonwealth v. Bizanowicz, 459 Mass. 400, 420, 945 N.E.2d 356 (2011). See Rutherford, 476 Mass. at 646 (improper to ask jury to imagine victim's final thoughts). The Commonwealth argues that, by telling the jury that they walked Lord's last walk [*515] and stood in the spot where she was killed, the prosecutor properly referenced the view, see Commonwealth v. Gomes, 459 Mass. 194, 201, 944 N.E.2d 1007 (2011), and reminded the jury of the sequence of events leading to her death. Even if the statements were close to the line or if the jury did not understand them as a reference to the view, they did not create a substantial likelihood of a miscarriage of justice for the reasons discussed *supra*. Following the prosecutor's closing, the defendant objected at sidebar to "the reference to Cindy Lord and Dennis Lord, what they were doing, how they were feeling. … I just think that's a patent asking for emotion that just doesn't have a place in this court, in this trial."[9] Following this objection, the judge instructed the jury:

"To the extent there was a reference to Mr. and Mrs. Lord, I just ask you to focus on their testimony they gave in this court and why they were on the witness stand, why Mrs. Lord was on the witness stand, and not on anything else."

---

[9] The prosecutor stated in his closing:

"What are Cindy and Dennis Lord doing that night? What are they doing that night? You know what they're doing. They've come in from Wilbraham, they're scratching and clawing for every shred of information that they can get about their daughter who's gone missing. Okay? Teetering on the brink, waiting, hoping, praying for good news. And you know the devastating news they got that night. That excruciatingly painful news that was delivered by Detectives Sheehan and Cecil. And as their world became unplugged and blown apart, what is the selfish man doing at that moment?"

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 10 of 13

488 Mass. 499, *515; 174 N.E.3d 649, **664; 2021 Mass. LEXIS 576, ***29

The defendant did not object to this supplemental [***30] instruction.

Another objected-to portion of the prosecutor's closing that referenced Lord's mother was an attempt to illustrate the planning and consciousness of guilt of the defendant:

> "You've seen the signatures in the upper two left-hand corners, Exhibits 28, 29, and 30, ladies and gentlemen, Amy Lord at the Bank of America, at the Sovereign Bank[,] and at the Citizens Bank, identified by her mother, Cindy Lord.
>
> "Why did Cindy Lord have to be in that position? Why was she put in a position where she had to come into Suffolk Superior Court and identify her daughter on those stills from those banks? It was this defendant's [***31] plan, his actions, what he did that day."

 [*516] The prosecutor was directing the jury's attention to the fact that the defendant [**665] evaded the bank cameras. It was reasonable for the prosecutor to reference evidence relevant to the defendant's intent, including evidence of the defendant's mental state. See Commonwealth v. Muller, 477 Mass. 415, 432, 78 N.E.3d 51 (2017) (prosecutor permitted to argue during closing argument that "the defense of lack of criminal responsibility was weak, and that although the defendant may suffer from mental illness, he was criminally responsible"). As we have stated, a prosecutor is entitled to argue the Commonwealth's case "aggressively and resourcefully" (citation omitted). See Commonwealth v. Shelley, 374 Mass. 466, 472, 373 N.E.2d 951 (1978), S.C., 381 Mass. 340 (1980) and 411 Mass. 692, 584 N.E.2d 629 (1992). Although evidence of the defendant's plan to murder Lord and of his consciousness of guilt is relevant to his mental state at the time of the crime, and to the defense theory of lack of criminal responsibility, the prosecutor's envelopment of this argument in details about Lord's mother overstepped the bounds of proper argument.

As previously mentioned, the prosecutor also described what the defendant was doing after he killed Lord and compared it to what Lord's parents were doing:

> "What are Cindy and Dennis Lord doing that night? What are [***32] they doing that night? You know what they're doing. They've come in from Wilbraham, they're scratching and clawing for every shred of information that they can get about their daughter who's gone missing. Okay? Teetering on the brink, waiting, hoping, praying for good news. And you know the devastating news they got that night. That excruciatingly painful news that was delivered by Detectives Sheehan and Cecil. And as their world became unplugged and blown apart, what is the selfish man doing at that moment?"

The prosecutor then recounted that the defendant was eating, drinking, and setting off firecrackers with a friend.

Although certain of the prosecutor's references to Lord's parents were improper, the objected-to statements regarding the prosecutor's references to Lord's parents were not prejudicial in light of the judge's instruction following the closing argument. See Kolenovic, 478 Mass. at 201 ("We presume that the jury follow the judge's instructions and have held that even such [*517] general instructions can diminish prejudice suffered by the defendant"). In addition to the curative instruction, the judge instructed after closing arguments that the case must be decided based upon evidence, and not based upon [***33] emotion or sympathy.

3. *Motion for a new trial*. Following his convictions, the defendant moved for a new trial and requested a hearing. The defendant argues that he raised a substantial issue meriting an evidentiary hearing and that the motion should not have been denied without a hearing. He argued, as he does on appeal, that his rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights were violated because his counsel acknowledged his guilt at trial while pursuing a defense of lack of criminal responsibility over his objection.[10] The defendant also averred that his counsel told him that if he [**666] did not want to raise the insanity defense, the judge would remove the defendant from the court room, and that counsel would stop representing him. Counsel confirmed with the defendant's appellate counsel that, had the defendant said he did not want to pursue an insanity defense, counsel would have withdrawn from the case.

The decision to grant or deny a motion for a new trial is within the sound discretion of the motion judge. See Commonwealth v. Sanchez, 485 Mass. 491, 498, 151 N.E.3d 404 (2020). A judge may rule on a motion for a new trial based on the affidavits or other supporting material, without an evidentiary hearing, if no "substantial issue" is raised. Commonwealth v. Vaughn, 471 Mass. 398, 404, 30 N.E.3d 76 (2015). "A defendant's submissions in [***34] support of a motion for a new trial need not prove the factual premise of

---

[10] The defendant relies on defense counsel's closing argument to support his contention. In closing argument, defense counsel said to the jury, "I'm telling you that beyond a reasonable doubt that man is guilty of everything he's been charged with, beyond a reasonable doubt. Perhaps beyond any doubt. … [But] I ask you to consider … the defense that's been offered to you. … I ask that you find him not guilty by reason of insanity."

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 11 of 13

488 Mass. 499, *517; 174 N.E.3d 649, **666; 2021 Mass. LEXIS 576, ***34

that motion, but they must contain sufficient credible information to 'cast doubt on' the issue" (citations omitted). Commonwealth v. Goodreau, 442 Mass. 341, 348, 813 N.E.2d 465 (2004).

In determining whether a substantial issue exists and therefore an evidentiary hearing should be held, "a judge considers the seriousness of the issues raised and the adequacy of the defendant's showing on those issues" (citation omitted). Commonwealth v. Welch, 487 Mass. 425, 445, 167 N.E.3d 1201 (2021). "We review a judge's [*518] decision to deny a motion for a new trial without holding an evidentiary hearing 'for a significant error of law or other abuse of discretion.'" Commonwealth v. Upton, 484 Mass. 155, 162, 139 N.E.3d 1159 (2020), quoting Commonwealth v. Bonnett, 482 Mass. 838, 843-844, 129 N.E.3d 847 (2019). The issue the defendant raised meets the requirement of seriousness. "[I]t is the defendant's prerogative, not counsel's, to decide on the objective of his [or her] defense." See McCoy v. Louisiana, 138 S. Ct. 1500, 1505, 200 L. Ed. 2d 821 (2018). The Sixth Amendment and art. 12 guarantee the defendant the right to maintain his or her innocence. See id. at 1508. If counsel admitted guilt over a client's express objection it would be a structural error that requires a new trial without any need to show prejudice. See id. at 1511. A "defendant always retain[s] exclusive authority to make 'certain fundamental decisions' regarding his [or her] own defense, including whether to insist on [***35] his [or her] innocence." Commonwealth v. Miranda, 484 Mass. 799, 819, 146 N.E.3d 435, cert. denied, 141 S. Ct. 683, 208 L. Ed. 2d 287 (2020), quoting Jones v. Barnes, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983).

Whether the defendant has made an adequate showing on this issue is a different question entirely. Welch, 487 Mass. at 445. "[T]he defendant's submissions 'need not prove the [motion's] factual premise ... but they must contain sufficient credible information to cast doubt on the issue.'" Id., quoting Upton, 484 Mass. at 162. In this case, whether the defendant has made an adequate showing that he was deprived of his Sixth Amendment right to refrain from admitting guilt depends on whether he presented sufficient credible evidence that cast doubt on whether he "expressly assert[ed] [at trial]" that "the objective of 'his' defence' [was] to maintain innocence." McCoy, 138 S. Ct. at 1509.

In 2015, we declined to consider "whether it is manifestly unreasonable to pursue ... a strategy [of conceding that the defendant killed the victim] (regardless of its merits) without the defendant's consent, or whether prejudice should be presumed in such circumstances." Commonwealth v. Evelyn, 470 Mass. 765, 771 n.10, 26 N.E.3d [**667] 158 (2015).

Since then, however, as discussed, the United States Supreme Court decided McCoy. There, the Court concluded that the "[a]utonomy to decide that the objective of the defense is to assert innocence" belongs to the defendant. McCoy, 138 S. Ct. at 1508. A violation of this "Sixth Amendment-secured [***36] autonomy" constitutes structural error. Id. at 1511. The Court did not, however, conclude that it is manifestly unreasonable to pursue a strategy of conceding guilt without the defendant's express consent. Where a defendant complains about counsel's [*519] admission of guilt only after trial, the defendant's autonomy is not overridden. See id. at 1505, quoting Florida v. Nixon, 543 U.S. 175, 181, 192, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004) ("when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, '[no] blanket rule demand[s] the defendant's explicit consent' to implementation of that strategy" [citation omitted]). See Atwater v. State, 300 So. 3d 589, 590 (Fla. 2020).

The judge was entitled to discredit the defendant's affidavit that he submitted with his motion for a new trial stating that he had objected to his counsel's use of the insanity defense on multiple occasions. See Commonwealth v. Furr, 454 Mass. 101, 112, 907 N.E.2d 664 (2009). The defendant also averred that he had not known that pursuing an insanity defense meant conceding guilt to the crimes charged and that had he known, he would have objected in open court.[11]

The defendant's appellate counsel also submitted an affidavit, in which he described conversations he had had with the defendant's trial counsel, Jeffrey Denner and Michelle Hubbard. [***37] According to the affidavit, Denner and Hubbard told appellate counsel that the defendant never objected to the insanity defense. To the contrary, the defendant agreed with them that the insanity defense was his best available option considering the evidence in the case.[12] Denner also told appellate counsel, however, that the attorneys never discussed with the defendant that raising an insanity defense required conceding that the defendant had killed Lord.[13] The motion judge was within her discretion to

---

[11] The defendant does not explain why he did not object upon hearing argument and testimony regarding his concession of guilt.

[12] At one point during trial, defense counsel reported to the judge that the defendant "can't quite understand why I'm not attacking everybody viciously, you know, because everyone is lying."

[13] This is not surprising considering that the logic inherent in an insanity defense presupposes an admission that the defendant committed the acts in question but seeks to prove that he or she is not

Case 1:22-cv-11678   Document 1-1   Filed 10/03/22   Page 12 of 13

488 Mass. 499, *519; 174 N.E.3d 649, **667; 2021 Mass. LEXIS 576, ***37

discredit the defendant's affidavit as self-serving, see Commonwealth v. Grant, 426 Mass. 667, 673, 689 N.E.2d 1336 (1998), and to disbelieve that the defendant objected to his counsel's use of the insanity defense. Significantly, neither of the defendant's trial counsel submitted an affidavit. This is a notable omission and was a factor the judge could consider. Commonwealth v. Lys, 481 Mass. 1, 6, 110 N.E.3d 1201 (2018).

The trial record supports the judge's determination that the defendant's affidavit was not credible and that therefore no sub- [*520] stantial issue had been raised. The record shows that the defendant was aware of how to make his needs and concerns known during trial. At one point he had indicated to trial counsel that he was not feeling well. The next day, before trial, he told counsel that he was [***38] not well, and the [**668] judge arranged for emergency medical technicians to examine him. He was also brought to Massachusetts General Hospital for evaluation.

The defendant had numerous opportunities before and during the trial when he could have raised his concerns with defense counsel or the judge. For example, the defendant provided notice of an insanity defense one year before trial and was interviewed by his expert. In addition, the issue of a defense of not guilty by reason of insanity thoroughly and repeatedly was pursued during the jury selection process in the defendant's presence. The defense attorney stated in his opening that the defense was based on mental illness, not that the defendant did not commit the attacks. During the trial, defense counsel attempted to elicit information from Commonwealth witnesses that would strengthen his defense of not guilty by reason of insanity, and Ablow and Kelly testified extensively regarding his mental health. Notwithstanding the defendant's claim in his affidavit that had he known that he was conceding that he was the perpetrator he would have objected in open court, the defendant remained silent on numerous occasions when the defense strategy [***39] was abundantly clear.

The facts here differ significantly from those in *McCoy*. In McCoy, 138 S. Ct. at 1506-1507, the defendant maintained his innocence — to his counsel and in open court — while his counsel "told the jury there was 'no way reasonably possible'" that they could hear the prosecution's evidence and reach "any other conclusion than Robert McCoy was the cause of these individuals' death." Counsel further told the jury that the evidence was "unambiguous," "my client committed three murders," and that the defense "took [the] burden off of [the prosecutor]" with respect to the issue

---

responsible for the acts. See McHoul, 352 Mass. at 546-547.

whether the defendant had killed the victims. *Id.* Unlike counsel in this case, counsel in *McCoy* presented no defense at all, as the concession of guilt at the guilt phase of the trial was an unsuccessful attempt to avoid the death penalty at the sentencing phase. Id. at 1507.

The motion judge did not err in concluding that the defendant failed to present a substantial issue warranting an evidentiary hearing, where, although the issue raised was serious, the defendant did not make an adequate showing of a credible claim. See [*521] Welch, 487 Mass. at 446 (no substantial issue that warranted hearing where claim of ineffective assistance of counsel constituted serious [***40] issue but motion judge who was also trial judge did not credit certain assertions of defendant and "[w]hat he observed indicates that any communication issues were likely of the defendant's own making"); Upton, 484 Mass. at 162-163 (no substantial issue warranted hearing where claimed due process violation constituted serious issue but evidence not sufficiently credible because defendant failed to present affidavits from counsel regarding alleged undisclosed plea agreement); Goodreau, 442 Mass. at 355 n.9 (no substantial issue that warranted hearing where defendant presented no evidence that counsel failed to investigate all available defenses and where motion reflected defense counsel's belief that he had valid theories of defense with supportive evidence); Commonwealth v. Stewart, 383 Mass. 253, 257-258, 418 N.E.2d 1219 (1981) (adequacy of defendant's showing on issue of newly discovered evidence not sufficient to warrant evidentiary hearing where affidavit presented no indicia of reliability and constituted hearsay solely [**669] admissible for impeachment).[14]

4. *Review under* G. L. c. 278, § 33E. We have reviewed the record in its entirety under G. L. c. 278, § 33E. No such relief is warranted.

*Judgments affirmed.*

*Order denying motion for a new trial affirmed.*

---

[14] We note, however, that a client's autonomy is an issue separate from counsel's competence. "[W]e do not apply our ineffective-assistance-of-counsel jurisprudence" to the defendant's claim. McCoy, 138 S. Ct. at 1510-1511. See Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See also Miranda, 484 Mass. at 822 (applying traditional ineffective assistance rules because [***41] defense counsel and defendant shared same principal objective of outright acquittal); Atwater, 300 So. 3d at 590 (applying ineffective assistance analysis to issue regarding counsel's failure to consult with defendant).

488 Mass. 499, *521; 174 N.E.3d 649, **669; 2021 Mass. LEXIS 576, ***41

---

**End of Document**